1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

Rosalyn Christopherson
1770 Greensburg Road
Lower Burrell, PA
724 304 7581
rc1066rc@aol.com

PLAINTIFF

v.

Polyconcept, North America
400 Hunt Valley Road
New Kensington, PA 15068
724 334 4000
inquiries@polyconcept.com

DEFENDANT

CASE NUMBER 2: 20 cv 00545

FILED

AUG 23 2021

CLERK U.S. DISTRICT COURT
WEST. DIST. OF PENNSYLVANIA

## AMENDED COMPLAINT

27 FIRST ALLEGATION.  In April 2017, Christopherson returned to the Embroidery department of

28 Apparel at Polyconcept, North America, for retraining as a result of an EEOC complaint filed in

29 March 2017.  She originally joined the staff at Polyconcept in October 2014 and was hired as a

30 permanent employee in January 2015.  She was granted FMLA intermittent/reduced schedule

31 leave in the Fall of 2016 for a medical condition arising from a physical attack in December

32 2015.  As a result of the trainer's schedule of eight-hour only training, and the plaintiff's

33 exhaustion from having to change shifts in order to retrain, Christopherson informed her

34 supervisor, Jason Krause, that she would act on her FMLA and work only eight hours to coincide

35   with the trainer's schedule.  Prior to stating that she would invoke her FMLA, she was working

36   ten hours, packing and performing miscellaneous tasks for two hours until the trainer could

37   train her.  Mr. Krause stated that she could not utilize her FMLA but would have to remain on

38   the ten-hour schedule.  Upon speaking with Brandy Ferguson, another supervisor, the next day,

39   Christopherson was again told she could not utilize her FMLA to avoid the two hours of

40   overtime.  She received disciplinary action, being written-up by Brenda Scholl, HR director,

41   several days later for falling asleep after exhaustion.  When she asked what would happen if

42   she did not sign the write-up, Ms. Scholl informed her that they were being "lenient" with her

43   and that she could be dismissed on the spot if she did not sign the paperwork.  Fearing for her

44   job, Christopherson signed the write-up.   She, then, without further discussion with her

45   supervisors, invoked her FMLA privileges, calling off on the "call-off" line each morning for two

46   hours, arriving for an eight-hour shift coinciding with the trainer's schedule.  After utilizing her

47   FMLA leave in this manner, there were no further incidents of sleeping on the job due to

48   exhaustion.  Christopherson completed her time with the trainer without further complications

49   or interference from supervisors.  In each instance of Christopherson informing her supervisors

50   that she would invoke her FMLA privileges to work a reduced schedule, she was informed by

51   these supervisors that she could not.  Therefore, the refusal of Christopherson's FMLA privilege

52   was deliberate.  Prior to speaking to Ferguson and Krause concerning this incident, she had

53   acted upon her FMLA privileges while on her previous shift without incident before the filing of

54   her EEOC complaint.  According to 29 CFR section 825.301 and section 825.302 of the Family

55   Medical Leave Act (FMLA), she was compliant, being eligible and approved for FMLA leave and

56   giving sufficient notice to her employee of her need to invoke her privileges. Due to the

57   Defendant's agents, Krause's and Ferguson's, willful acts of refusing her need to invoke her

58   FMLA privileges, the statute permits a lawsuit to be brought against the Defendant within a

59   three-year time limit according to 29 CFR 825.105 (a)(1): "It shall be unlawful for any employer

60   to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided

61   under this title," and 29 CFR 825.107 (c)(2), "In the case of an action brought for a willful

62   violation of section 105, such action may be brought within three years of the date of the last

63   event constituting the date of the alleged violation for which such action is brought."  Also,

64   according to 29 U.S.C. section 2617(c)(1)-(2), a civil complaint for a willful violation of the FMLA

65   must be filed within three years, a violation defined as willful where an employer knew or

66   showed reckless disregard for whether its conduct was prohibited by law.  As a result of

67   disciplinary action taken against her after she fell asleep as a result of being denied a reduced

68   schedule according to her FMLA privileges, Christopherson was unable to receive promotions

69   and suffered great stress.  Therefore, her reputation and finances suffered harm as a result of

70   the willful actions of the Defendant Polyconcept and its agents.  Such harm may be

71   compensated under 29 CFR section 825.107 (a)(1)(A)(i)(I): "Any employer who violates section

72   105 shall be liable to any affected employee affected for damages equal to the amount of any

73   wages, salary, employment benefit, or other compensation denied or lost to such an employee

74   by reason of the violation." Support for Christopherson's claim is found in *Mesmer v. Charter*

75   *Communications*, Case Number 14 cv 5915 regarding willful interference of Plaintiff's rights

76   under FMLA and the three-year statute of limitations under such conditions.

77   SECOND ALLEGATION: In October 2017, Christopherson was approved again for FMLA leave for

78   an intermittent/reduced schedule leave by her medical provider.  She was eligible for such

79  leave according to 29 CFR section 825.301 and section 825.302 of the Family Medical Leave Act

80  (FMLA). This leave was a continuation of the first leave which began in October 2016. As

81  stated in the complaint, this second FMLA leave should have been authorized in May 2017 but

82  was delayed due to paperwork misfiling. Until October 2017, she had utilized her FMLA leave

83  on an as needed basis. Her medical provider specified "no mandatory overtime." Upon the

84  approval for October 2017. she was told that her medical provider had stated "no overtime."

85  she was informed by Brandy Ferguson, Jason Krause, and Allison Koehler that she would need

86  to punch in at 2pm and punch out at 10 pm for a total of eight hours on her shift. No overtime

87  until 12 midnight and no weekend overtime. Christopherson was also told that she would

88  receive a point for any absences. She was told by Ms. Ferguson and Mr. Krause that this

89  schedule was given in order to "help" her to not have to call-off when Saturday/Sunday work

90  was scheduled. Previously, when Christopherson utilized her FMLA in a flexible manner, she

91  sometimes worked overtime up to 50 hours/week (10 our days) but tried to avoid weekend

92  work to have two days of rest. She was informed that points accrued due to the delay in

93  paperwork from May 2017 until August 2017 when paperwork was resubmitted had been

94  resolved by her vacation time. She was told that she had no remaining PTO (paid time off)

95  because it had all been absorbed in her FMLA. She was informed she had been given points

96  retroactively for time taken intermittently from August 2017 through October 2017 because

97  her medical provider had not specified that she could take whole days or half days off.

98  Christopherson had been utilizing her FMLA as "pending" when calling in and with the

99  understanding that she did not have to work overtime but could utilize her leave on an hourly

100 basis as she had in the past. She was given this information by Allison Koehler. When she

4

101    questioned Ms. Koehler about the points, she was informed by Ms. Koehler that her medical

102    provider only stated that she could not work overtime.  Ms. Koehler told Plaintiff that she

103    would need to have her medical provider recertify her for "flareups" and specify that she could

104    take one or two days off each week for flareups.  When Christopherson objected to the idea of

105    flareups because her condition was not one of predictability, Ms. Koehler informed her that she

106    had faxed and spoken with Christopherson medical provider repeatedly to determine exactly

107    what was meant concerning the phrase "no overtime." Ms. Koehler stated that the medical

108    provider was clear concerning no overtime and that the previous certification had stated "no

109    mandatory overtime." Christopherson threatened legal action concerning the retroactive

110    points based on leave taken between August 2017 and October 2017 as assigned unfairly

111    because she had not received notice of a request for flareups to be added to her certification.

112    She was informed to go back and get the paperwork changed to account for flareups and exact

113    days needed off.  When she returned to her medical provider, her provider stated that her

114    condition was not classifiable in terms of flareups, and that her condition of anxiety could not

115    be classified with predictability as her employer wished.  Christopherson's medical provider did

116    not wish to change the paperwork to include flareups since this was not the nature of her

117    illness and the medical provider did not want Christopherson's employer to require her to keep

118    revising the paperwork.  Therefore, her paperwork was not revised to include flareups.  She was

119    then forced to work a mandatory 40-hour week from October 2017 until April 2018 when her

120    FMLA leave expired.  Points from August 2017 through October 2017 were removed.  However,

121    she was unable to have any time off other than the avoidance of overtime, her vacation and

122    PTO being subsumed under the FMLA by her employer.  She had to adhere to a strict schedule

123    of 8-hour days/40-hour weeks. During times of anxiety, she was unable to utilize the leave in

124    order to come into work a few hours later or leave a few hours early or take a day off from time

125    to time. As such, Christopherson experienced undue stress and greater anxiety. She later

126    surmised this manipulation of her FMLA leave into a strict schedule was done in order to

127    comply with "metrics" or the quota system of production, although no one expressly stated

128    that this was the case at any time. Within this system, there are to be a certain number of

129    decorators and a certain number of packers (usually temporary workers) in order to calculate

130    various daily metrics for production. She was a decorator. If she would be few hours late or

131    left early, the metric would change. For metrics at Polyconcept to work, there cannot be more

132    packers than decorators. Thus, if a decorator should not work for the entire 8-hour shift, then

133    the decorator-to-packer ratio would be affected. She now assumes this is the reason Ms.

134    Koehler needed her to specify what days off she would need so that she would not be

135    calculated into the metric and the number of packers would be configured around the number

136    of decorators to make metrics work. Due to manipulation, Christopherson was forced into an

137    8-hour day/40-hour week. Upon her recertification in October 2017, Polyconcept used the

138    phrase "no overtime" by her medical provider to control how she could utilize her FMLA rather

139    than permit her to utilize the leave on an as needed basis. She requested to utilize her FMLA

140    privileges on an as-needed basis as she had done during her first certification, working no more

141    than 40 hours during a week but with the flexibility of not have to work eight hours per day, but

142    was told by Ms. Koehler that she could not without additional revisions for flareups. When

143    questioned by Christopherson as to whether all employees seeking FMLA reduced schedules

144    were treated in this manner, Ms. Koehler responded that this was Polyconcept's policy. She

145    later discovered that other employees were permitted to have flexible reduced

146    schedules/intermittent leave.  Moreover, if Polyconcept wanted to keep metrics balanced,

147    Polyconcept could have accommodated her in a different position during her leave which did

148    not involve metrics.  No such accommodation was offered.  Polyconcept's actions concerning

149    this FMLA leave granted from October 2017 through April 2017 constitute willful violations.

150    Polyconcept interfered with the free use of her intermittent FMLA by constraining it to fit a

151    schedule of metrics.  This constraint was willful and a violation of the law. The statute permits a

152    lawsuit to be brought against the Defendant within a three-year time limit according to 29 CFR

153    825.105 (a)(1): "It shall be unlawful for any employer to interfere with, restrain, or deny the

154    exercise of or the attempt to exercise, any right provided under this title," and 29 CFR 825.107

155    (c)(2), "In the case of an action brought for a willful violation of section 105, such action may be

156    brought within three years of the date of the last event constituting the date of the alleged

157    violation for which such action is brought."  Also, according to 29 U.S.C. section 2617(c)(1)-(2), a

158    civil complaint for a willful violation of the FMLA must be filed within three years, a violation

159    defined as willful where an employer knew or showed reckless disregard for whether its

160    conduct was prohibited by law.  Again, support for Christopherson's claim of willful violations

161    under the three-year statute is found in *Mesmer v. Charter Communications*, (No.14 cv 5915,

162    2015) regarding willful interference of employees' rights under FMLA and the three-year

163    statute of limitations under such conditions.  Christopherson's intermittent leave could have

164    been taken on a flexible, as needed basis by providing an accommodation of a transfer to

165    another non-metric position according to 29 CFR 825.204(a): "the employer may require the

166    employee to transfer temporarily, during the period that the intermittent or reduced leave

167    schedule leave is required, to an available alternative position for which the employee is

168    qualified and which better accommodates recurring periods of leave than does the employee's

169    regular position." This issue was upheld in *Brunckhorst v. City of Oak Park Heights* (0:16-cv

170    00455). FMLA regulations prohibit an employer from obtaining additional documentation from

171    the medical provider once a sufficient and complete medical certification has been provided.

172    29 CFR 825.307(a) states, "If an employee submits a complete and sufficient certification signed

173    by a health care provider, the employer may not request additional information from the health

174    care provider." In *Oak Harbor Freight Lines, Inc. v. Antti* (No. 3:12 cv 488, 2014), it was ruled

175    that the employer could not require more medical information once a sufficient certification

176    had been provided. Christopherson's request for a flexible schedule for her

177    intermittent/reduced schedule FMLA was denied, contrary to 29 CFR 825.302(f) which states,

178    "The employee and employer must attempt to work out a schedule for such leave that meets

179    the employee's needs without unduly disrupting the employer's operations, subject to the

180    approval of the health care provider." According to 29 CFR 825.205(a)(1), "when an employee

181    takes FMLA leave on an intermittent or reduced leave schedule basis, the employer must

182    account for the leave using an increment no greater than the shortest period of time that the

183    employer uses to account for other forms of leave provided that it is not greater than one

184    hour." Exception to this are covered by 29 825.205: "Where it is physically impossible for an

185    employee using intermittent leave or working a reduced schedule to commence or end work

186    mid-way through a shift, such as where a flight attendant or a railroad conductor is scheduled

187    to work aboard a plane or a train, or a laboratory employee is unable to enter or leave a sealed

188    'clean room' during a certain period of time, and no equivalent position is available, the entire

189    period that the employee is forced to be absent is designated as FMLA leave and counts against

190    the employees FMLA entitlements." Since there was no physical impossibility for

191    Christopherson to take her intermittent leave hourly, she should have been permitted to take

192    her leave hourly or transferred temporarily for accommodation. Upon informing Ms. Koehler

193    that her medical provider would make no further revisions to her certification, there was no

194    further dialogue with Christopherson concerning her request for a flexible schedule.

195    Polyconcept's violation of FMLA laws harmed Christopherson and, as such, she is entitled to

196    compensation.

197    THIRD ALLEGATION: In January 2019, Christopherson began feeling ill some days before January

198    21, 2019. As a result of body aches and flu-like symptoms which had been increasing,

199    Christopherson called off from work on January 21, 2019, taking a few leftover antibiotics. As

200    the days went by, back and leg pain increased. On January 29, 2019, she left work one hour

201    into her shift due to back pain and loss of bodily functions. She was escorted out by her

202    supervisor, Ashley Salfemoser. She eventually arrived at an ER and was given medication for

203    muscle spasm and a doctor's note for excused days. The medication given was only enough for

204    a few days and indicated she should not operate machinery while taking the medication. Upon

205    returning to work, she was informed that Polyconcept no longer accepted doctor's notes and

206    that Christopherson would need an FMLA. She was also informed that she received points for

207    January 29, 2019, and the day(s) following which she missed due to the ER and treatment. She

208    requested a meeting with Allison Koehler, an FMLA HR manager, by leaving a voicemail

209    message for her. Later, she was told Adam Buchbinder, another FMLA HR manager, would

210    meet with her. She requested the FMLA paperwork. She asked at this time if she could have

211  her medical provider backdate the paperwork to include January 29, 2019, to avoid this

212  disciplinary point. It was agreed. She then complied, visiting a chiropractor where she was

213  diagnosed with sciatica. Christopherson's medical provider backdated the certification to

214  January 29, 2019, for a total of eight weeks of intermittent leave and the certification was

215  submitted to Polyconcept. In April, Ms. Salfemoser informed Christopherson that she had

216  received a point for January 21, 2019. When Plaintiff stated that she had been ill which

217  eventually resulted in her becoming seriously ill on the job on January 29, 2019, Ms. Salfemoser

218  told Christopherson to discuss this matter with Mr. Buchbinder. In speaking with Mr.

219  Buchbinder, Christopherson noted that had she been informed of the point for January

220  21,2019, she would have had her medical provider backdate to that date to avoid the point.

221  Mr. Buchbinder agreed to fax her medical provider new paperwork in order to revise the first

222  certification. After 2-3 weeks of waiting, her medical provider stated he had not received any

223  such fax from Polyconcept. She then requested to meet with Mr. Buchbinder again. At this

224  meeting, Mr. Buchbinder informed her that he and Tom Medice, another HR manager, had

225  listened to her initial call-off recording in which she stated she felt like she had "a sore throat"

226  and was "coming down with something." Mr. Buchbinder chuckled, then informed her that

227  sciatica "has nothing to do with a sore throat," that a sore throat condition is not eligible under

228  FMLA, that the point against her would be retained, that no further paperwork would be faxed

229  to her medical provider or given to Christopherson, and that there was not anything she could

230  do about it. Christopherson stated that she wished to contest the point but was offered no

231  further solutions by Mr. Buchbinder. She had previously researched that sciatica may be due to

232  infection. She then contacted the Department of Labor (DOL) in Pittsburgh concerning this

233  matter. She first spoke with Mr. John Porter who did the complaint intake. The complaint

234  focused on the fact that no medical evidence was offered in her meeting in which she was told

235  that her call-off was due to a "sore throat" and that, in essence, symptoms of infection are not

236  involved with sciatica. After intake, Mr. Porter forwarded he concerns to his assistant, a "Mr.

237  DeAngelo," who informed her that FMLA laws allow for a second opinion at the expense of the

238  employer and, if necessary, a third opinion also paid for by the employer. Mr. DeAngelo then

239  stated he would contact Polyconcept concerning a second opinion. According to 29 CFR

240  825.307(b): "An employer who has reason to doubt the validity of a medical certification may

241  require the employee to obtain a second opinion at the employer's expense." 29 CFR

242  825,307(b)(2) states that, "The employer is permitted to designate the health care provider to

243  furnish the second opinion provider, but the selected health care provider may not be

244  employed or a regular basis by the employer. Finally, if a third opinion is needed, 29 CFR

245  825.307(c) states, "If the opinions of the employee's and employers designated health care

246  providers differ, the employer may require the employee to obtain certification from a third

247  health care provider, again at the employer's expense. This third opinion shall be final and

248  binding." Upon speaking with Mr. DeAngelo again, Christopherson was informed that

249  Polyconcept's representatives informed him that Polyconcept had given her the opportunity to

250  correct the matter. When she told Mr. DeAngelo that this was a false statement, that no

251  further communication had taken place since her last meeting with Mr. Buchbinder before she

252  contacted the DOL, Mr. De Angelo contacted Polyconcept again. This time, he was told by

253  Polyconcept that they had given Christopherson the opportunity to correct the matter but that

254  she "had done nothing to resolve it." This was also a false statement. She informed Mr.

255    DeAngelo that she had no contact with Mr. Buchbinder or other HR representatives after her

256    meeting before contacting the DOL.  Mr. DeAngelo then told her that she would have to file a

257    lawsuit if she wished further action.  Christopherson asserts that Polyconcept and its agents

258    interfered with her rights under the FMLA statute which provided herself and Polyconcept to

259    gain clarification of her certification.  Such clarification could have prevented the disciplinary

260    point since Polyconcept's representatives decided on their own what constituted sciatica

261    without presenting a medical opinion.  When she sought what options might be available to her

262    by contacting the DOL, Polyconcept's representatives interfered further by providing

263    representatives of the DOL with false and misleading information.  Supporting Christopherson's

264    argument concerning a second opinion is Jacintha *Pollard v. The New York Methodist Hospital*

265    (No. 15-3231, 2017) where Pollard contended the Hospital was estopped from challenging her

266    FMLA entitlements because the hospital never obtained a second medical opinion to contradict

267    whether she had a serious health condition. Christopherson maintains that Polyconcept

268    interfered with her rights contrary to 29 CFR 825.220(1), "An employer is prohibited from

269    interfering with, restraining, or denying the exercise of (or attempts to exercise) any rights

270    provided by the Act."  She received a disciplinary point which counted against her for

271    promotions.  As such, Polyconcept is in violation of 29 CFR 825.220(b): "Any violations of the

272    Act or of these regulations constitute interfering with, restraining, or denying the exercise of

273    right provided by the Act. An employer may be liable for compensation and benefits lost by

274    reason, of the violation, or other monetary losses sustained as a direct result of the violation,

275    for other actual monetary losses sustained as a direct result of the violation, and for

276  appropriate equitable or other relief, including employment, reinstatement, promotion, and

277  any other relief tailored to the harm suffered."

278  FOURTH ALLEGATION: In May 2019, Christopherson saw a medical provider after experiencing

279  high blood pressure.  Later, in July 2019, she began feeling heart flutters and lightheadedness.

280  After complaining to her doctor, she was given a series of heart tests.  This complaint followed

281  an episode in which she felt ill while preparing to leave her house for work one morning.  She

282  experienced heart flutters and lightheadedness.  Nevertheless, she got into her car and began

283  driving to work.  She was not sure if she needed to pull over to rest along the way, so she called

284  the call-off line to report she would be a little late in order to account for possibly having to pull

285  over and rest.  She did not pull over and rest but chose instead to drive on to work, arriving at

286  5:55am.  Once in the parking lot, she felt weak and did not want to chance stepping out from

287  her car and walking with her bags into the building.  She felt she might collapse.  She took a few

288  extra minutes to sit inside her car until she felt better.  She entered the building at

289  approximately 6:15am but did not punch in until 6:25am.  She delayed punching in because she

290  sat down at a table in the break room to rest a few minutes and then went to the bathroom

291  and to her locker.  She did not punch in until she felt ready to work.  She was later told by

292  Salfemoser that she had only 15 minutes of PTO remaining such that she received a half-point

293  against her attendance for the time between 6:15am and 6:25am.  This half-point also took

294  Christopherson to a cumulative total of six points, generating a written warning.  At eight

295  points, termination.  Her remaining points involved the new "no fault," "advance notice"

296  attendance policy in which points were given for any call-off without 24-hour notice.  Thus, all

297  same-day call-offs resulted in points.  Her other call-offs involved the emergency veterinarian

13

298    trips and deaths of her two dogs, lost car keys, and two call-offs for flu-like symptoms, one of

299    which was contested in Christopherson's THIRD ALLEGATION.  When Christopherson told

300    Salfemoser that she was ill and sitting in her car, Salfemoser informed her that her only option

301    to avoid the half-point was to get and FMLA.  Christopherson then met with Adam Buchbinder

302    and Tom Medice to discuss an FMLA or ADA accommodation. Christopherson agreed to first

303    seek an FMLA and was given the paperwork which was then completed by her medical provider

304    to cover retroactively the time of her symptoms as well as testing and rest going forward.  This

305    request was made with the express intention of removing the half-point and gaining time to

306    improve her health.  Polyconcept approved the FMLA.  The disciplinary half-point was not

307    removed.  When she later tried to bid on other jobs, she was told by Salfemoser that she could

308    not bid on other jobs with the written disciplinary action against her for six points.  Had this

309    half-point been removed upon FMLA approval, she would have been able to bid on jobs, having

310    only 5.5 points and no written warning.  As a result, she was only permitted to transfer within

311    the warehouse.  Later in October, four points were removed for perfect attendance during 4th

312    Quarter, the busiest season for Polyconcept, as an offer by Polyconcept to all employees to

313    encourage perfect attendance during that time.  By not removing the half-point covered by

314    Christopherson's FMLA at the time of her request, Polyconcept violated 29 825.220(1): "An

315    employer is prohibited from interfering with, restraining, or denying the exercise of (or

316    attempts to exercise) any rights provided by the Act.  She had the right to have the disciplinary

317    half-point removed as covered by her FMLA. As a result of this final half-point, she was harmed

318    by being unable to bid on other jobs in departments outside the warehouse.  Christopherson

319    contends that Polyconcept violated her FMLA privileges by retaining disciplinary action against

320    her which was covered by the FMLA statute. Support for this argument can be found in *George*

321    *v. Associated Stationers* (1:95 cv 1345, 1996), where it was argued that FMLA leave cannot be

322    counted under no-fault attendance policies.

323    FIFTH ALLEGATION: As a result of the aforementioned incidents, Christopherson makes a claim

324    against Polyconcept not only for FMLA interference but for FMLA retaliation.  FMLA laws

325    expressly forbids any employer from discriminating against any employee who opposes any

326    practice made unlawful by the FMLA. 29 U.S.C. § 2615(a)(2), and subject to the three-year

327    statute of limitations in 29 CFR 825.107 (c)(2) and 29 U.S.C. section 2617(c)(1)-(2).   Therefore,

328    the FMLA provides legal rights "that protect employees from discrimination or retaliation for

329    exercising their substantive rights under the FMLA." *Dotson v. Pfizer, Inc.*, 558 F.3d 284, 294

330    (4th Cir. 2009).  To establish a claim of FMLA retaliation, an employee must prove that the

331    employee engaged in protected activity under the FMLA. Secondly, the employer must have

332    taken adverse action against the employee. Finally, the adverse action must be causally

333    connected to the protected activity. *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 203 (4th Cir.

334    2016).  In Christopherson's FIRST ALLEGATION, she was disciplined by being written up for

335    falling asleep on the job although she had informed her employer of the need to utilize her

336    FMLA to avoid becoming overly tired and stress due to the shift change.  Rather than permit her

337    to utilize her privileges under her FMLA, she was denied and subsequently disciplined.  Had

338    Christopherson been permitted to utilize her FMLA for reduced hours, she would not have

339    fallen asleep on the job.  Christopherson contends that the purpose of the denial of her rights

340    under FMLA were to intensify her difficult in changing shift and to enact swift discipline with

341    the purpose of placing permanent negative information on her employment file and placing her

342   in a position for swift termination should she be found asleep on the job again. Because she did

343   not want to lose her job, Christopherson chose to act on her FMLA for the remainder of the

344   shift change without consulting her supervisors again.  By working reduced hours, she avoided

345   the stress and tiredness that was the result of the shift change and did not fall asleep again.  In

346   the SECOND ALLEGATION, Christopherson was again forced to work beyond her capacity.  She

347   was given her FMLA privileges in the sense that she was able to work a reduced schedule of 8-

348   hour shifts without overtime.  However, Christopherson was forced to work Monday through

349   Friday from September through April without the ability to take a day off.  She was informed by

350   her employer that if she called off for any reason, she would be terminated.  Knowing that the

351   purpose of Christopherson's FMLA was a reduced schedule to avoid overwork, Polyconcept's

352   requirements of Christopherson to work without a day off from September through April was

353   contrary to the purpose of the FMLA.  Plaintiff contends that Polyconcept's actions were based

354   on an attempt to retaliate against her for asserting FMLA privileges by overworking her under

355   the guise of permitting her FMLA reduced schedule.  In the THIRD ALLEGATION, Christopherson

356   was denied the opportunity to have a second or third medical opinion concerning her illness.

357   Her employer determined that her sciatica condition was not related to infection and dismissed

358   her request for her doctor to backdate her FMLA paperwork to cover the first day of her

359   symptoms, stating that those symptoms had nothing to do with sciatica.  When Christopherson

360   stated there was a connection and sought help from the Department of Labor, Polyconcept

361   (DOL), Polyconcept gave false information to the DOL, stating that they had given her the

362   opportunity to correct the matter.  Polyconcept, however, retained a disciplinary point against

363   Christopherson and failed to cooperate with her concerning arranging for a second and third

364    medical opinion.  Christopherson asserts that Polyconcept's main purpose for supplying false

365    information to the DOL and for retaining a point against Christopherson was to harm her

366    standing with the company in retaliation for utilizing FMLA privileges.  In the FOURTH

367    ALLEGATION, a half-point was retained against Christopherson after having secured FMLA

368    documentation and approval.  When she sought to bid on other jobs, she was told that she had

369    amassed 6 points and, therefore, could not bid on positions outside of the warehouse.  The

370    retention of the half-point permitted Polyconcept to hold a total of 6 points against her

371    attendance record, just enough to prevent her ability to obtain other more lucrative

372    employment within the company.  Christopherson contends that this limiting of her options

373    was interference by Polyconcept as well as retaliation with the purpose of consigning

374    Christopherson to only warehouse employment.  Christopherson contends that each of these

375    instances of retaliation were made as precursors to wrongful termination.

376    SIXTH ALLEGATION: Title VII of the Civil Rights Act of 1964 prohibits an employer

377    from retaliating against an employee who has "made a charge, testified, assisted or participated in" any

378    charge of unlawful discrimination under the Act.  To prove retaliation, a plaintiff must show, among

379    other elements, that he or she suffered an "adverse employment action." This federal law that protects

380    employees against discrimination based on certain specified characteristics: race, color, national origin,

381    sex, and religion. Under Title VII, an employer may not discriminate concerning any term, condition, or

382    privilege of employment. Violations may include recruiting, hiring, promoting, transferring, training,

383    disciplining, discharging, assigning work, measuring performance, or providing benefits.  In March of

384    2017, Christopherson made a complaint of discrimination to the Equal Employment Opportunity

385    Commission (EEOC) concerning discriminatory practices in the assignment of projects and work duties at

386  Polyconcept. An EEOC investigation then ensued. Christopherson eventually filed suit against

387  Polyconcept herself (Christopherson v. Polyconcept, 2:18—cv—00980) but was unable to obtain legal

388  representation due to a bankruptcy filing which was related to this prior case against Polyconcept. No

389  attorney Christopherson spoke to wished to take her case due to the bankruptcy filing for fear that their

390  fee would be subsumed into the bankruptcy.   She was also not able to continue with the case herself

391  *pro se* because of being overworked by Polyconcept during the time dating from September 2017

392  through April 2018 just prior to filing the lawsuit in July 2018, as previously noted, and beyond.

393  Christopherson was also overworked by being given many small orders which required a great deal

394  more work that larger orders which were given to other employees as delineated in her first case

395  against the company and this pattern continued and worsened as time progressed after her filing with

396  the EEOC.   Christopherson contends that employer Polyconcept's actions in the FIRST ALLEGATION,

397  SECOND ALLEGATION, THIRD ALLEGATION, and FOURTH ALLEGATION were actions of retaliation against

398  her for filing a charge of discrimination with the EEOC. Title VII makes it an unlawful employment

399  practice for a person covered by the Act to discriminate against a person "because he has opposed any

400  practice made an unlawful employment practice by this subchapter, or because he has made a charge,

401  testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this

402  subchapter." 42 U.S.C. § 2000e-3(a). *See Crawford v. Metro. Gov't of Nashville & Davidson Cty.,*

403  *Tenn.,* 555 U.S. 271, 274 (2009). Also, "a plaintiff making a retaliation claim under § 2000e-3(a) must

404  establish that his or her protected activity was a but-for cause of the alleged adverse action by the

405  employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar,* 133 S. Ct. 2517, 2534 (2013) (rejecting motivating

406  factor test in retaliation claim). The causation element may be inferred based on the proximity in time

407  between the protected action and the retaliatory act; however, if the proximity in time is the only

408  evidence to support plaintiff's retaliatory act, it must be "very close" in time. *See Yartzoff v. Thomas,*

409  809 F.2d 1371, 1376 (9th Cir. 1987) (holding causation may be inferred from proximity in time between

410  acts); *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001). There is no per se too long or

411  too short period of time that satisfies the causation requirement. *Howard v. City of Coos Bay*, 871 F.3d

412  1032, 1046 (9th Cir. 2017). Individuals or companies who violate 42 U.S.C. § 1981 for retaliatory conduct

413  can be held personally liable for punitive damages "1) if they participated in the deprivation of plaintiff's

414  constitutional rights; 2) for their own culpable action or inaction in the training, supervision, or control

415  of their subordinates; 3) for their acquiescence in the constitutional deprivations; or 4) for conduct that

416  showed a reckless or callous indifference to the rights of others." *Flores v. City of Westminster*, 873 F.3d

417  739, 757 (9th Cir. 2017). The statute of limitations for most employment based § 1981 claims is four

418  years. The Supreme Court in *Jones v. R.R. Donnelley*, 541 U.S. 369 (2004) held that a four-year statute of

419  limitations applied to any claims that were made possible by a post-1990 enactment.  Christopherson

420  contends that the adverse actions taken against her which include overwork, FMLA interference, and

421  disciplinary write-up and disciplinary points against her attendance were the result of Polyconcept's

422  retaliation against her for filing an EEOC complaint and instituting an investigation against the company.

423  The filing of the EEOC complaint served as the 'but-for' cause of the adverse actions taken against her.

424  All the actions which took place against her concerning her FMLA began one month after filing the

425  complaint and continued until throughout her employment.   The Complaint was filed in March 2017.

426  The adverse actions related to her FMLA began with the FIRST ALLEGATION which resulted in written

427  disciplinary action in April 2017.  The proximity to the filing of the EEOC complaint and the FIRST

428  ALLEGATION, then, is one month.  Next, in the SECOND ALLEGATION, points were accumulated unjustly

429  during an FMLA leave period due to misfiled paperwork in the months from May 2017 through August

430  2017, during the EEOC investigation.  Christopherson contends that these points were given to her in an

431  effort to amass enough attendance points to justify termination.  After she complained, the points were

432  removed but she was then required to work a 40-hour reduced schedule (no mandatory overtime), but

433  with no days off until April 2018.  Christopherson was informed that if she called-off for any reason

434    during this period that her FMLA was in effect, she would be terminated. Setting up a situation of

435    overwork and structuring it so that she had to work 40 hours each week with the threat of termination if

436    needing even one day or one hour off, Christopherson asserts, was an effort by Polyconcept to appear

437    to be permitting her FMLA while overworking her where at any moment a call-off would justify swift

438    termination. This was done in retaliation for the EEOC filing and investigation. Another issue of

439    overwork involved giving Christopherson many small orders to complete while requiring her to meet the

440    metrics standard. A meeting was held with Christopherson in September 2018, only two months after

441    Plaintiff filed a lawsuit against Polyconcept, to prove to her that she was not given more orders than

442    certain other workers as she had complained. Christopherson was not given advanced notice of the

443    meeting or an opportunity to prepare for it. Christopherson considered the meeting a form of

444    harassment. The PowerPoint presentation, led by Jason Krause with HR representative Gretchen

445    Lockhard and other supervisors including Brandy Ferguson, failed to take into consideration that

446    Christopherson only worked from May 2017 through December 2017 for the one year shown in the

447    presentation, missing the first four months of the year because she was not permitted to return to

448    Embroidery until her EEOC complaint was known to HR, and worked very little overtime (which is

449    mandatory) between May 2017 and September 2017 since returning to Embroidery due to her FMLA.

450    Yet she was near the top of the list in terms of number of orders. For the following year of 2018, she

451    was again shown to be almost at the top of the list for most orders although she worked no overtime

452    from January 2018 through April 2018 due to her FMLA, unlike her counterparts. In addition,

453    Christopherson had a near zero record for misprints, also unlike her counterparts, despite the high

454    number of orders completed. Yet she was never given large orders which would help her to make

455    metrics. More orders of lesser quantity meant resetting the machine more often so that volume was

456    compromised which, in turn, compromised quota or "metrics." Some of these details concerning

457    workload are discussed in Plaintiff's prior case against Polyconcept. The THIRD ALLEGATION occurred

458 one month after the dismissal of Christopherson's first lawsuit against Polyconcept for failure to

459 prosecute for reasons previously discussed. The lawsuit was dismissed in December 2018. In January

460 2019, Christopherson became ill with sciatica. A point was held against her which could have been

461 removed through obtaining a second or third opinion, but she was denied by Polyconcept to obtain such

462 opinions. Next, in the FOURTH ALLEGATION a half-point was retain against FMLA policy. Christopherson

463 asserts that Polyconcept retained points against her for the purpose of preventing her success being

464 able to move into more lucrative jobs within the company and with the hope that a situation of

465 termination would soon result from such points. Christopherson asserts that her EEOC filing, and

466 lawsuit filing were a "but-for" cause of Title VII and Section 1981 and FMLA retaliation by her employer.

467 Out of desperation, Christopherson in the Fall of 2019 requested a lateral transfer within the warehouse

468 to Shipping in to avoid the unfair work assignments in the Embroidery Department even though she

469 would not receive a higher pay.

470 CONCLUSION: Plaintiff Christopherson contends that the actions of Defendant Polyconcept were done

471 1) to limit her prospects of prospering at the company and obtaining better paying positions and 2) with

472 the hope that disciplinary actions would accrue to justify termination, or that she would quit due to

473 exhaustion and 3) to hinder her ability to follow through with her EEOC complaint and carry out her

474 lawsuit against Polyconcept.

475 <u>DAMAGES</u>

476 Plaintiff seeks compensatory, liquidated, and punitive damages in excess of $100,000.

477

478

479 Dated August 22, 2021                                    Respectfully submitted,

480

481

482

483                                                          Rosalyn Christopherson, *pro se*

SERVICE By Mail to:

**Robert B. Cottington**
Dentons Cohen & Grigsby P.C.
625 Liberty Avenue, 5th Floor
Pittsburgh, PA 15222-3152
412-297-4677
Fax: 412-209-1906
Email: robert.cottington@dentons.com